UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                              :
RONALD A. ROGANTI,                                            :
                                                              :
                                    Plaintiff,                :
                         -v-                                  :
                                                              :
METROPOLITAN LIFE INSURANCE COMPANY,                          :          12 Civ. 161 (PAE)
METROPOLITAN LIFE RETIREMENT PLAN FOR                         :
UNITED STATES EMPLOYEES, SAVINGS AND                          :          OPINION & ORDER
INVESTMENT PLAN FOR EMPLOYEES OF                              :
METROPOLITAN LIFE AND PARTICIPATING                           :
AFFILIATES, THE METLIFE AUXILIARY PENSION                     :
PLAN, and THE METROPOLITAN LIFE                               :
SUPPLEMENTAL AUXILIARY SAVINGS AND                            :
INVESTMENT PLAN,                                              :
                                                              :
                                    Defendants.               :
                                                              :
------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

       This case turns on the construction of a nearly $2.5 million award by an arbitral panel.

Plaintiff Ronald A. Roganti claims that the award, in his favor and against his former employer

Metropolitan Life Insurance Company ("MetLife"), represented back pay.  It was therefore,

Roganti claims, a violation of the Employee Retirement Income Security Act of 1974, 29 U.S.C.

§§ 1001 *et seq.* ("ERISA"), for the Plan Administrator of his MetLife pension plan to exclude

that award from his historical income in tabulating his pension.  Defendants[1] disagree.  They

claim the arbitral award represented something other than back pay, although they are elusive as

to what that something was.  The case initially came before the Court on a motion to dismiss,

---

[1] Defendants are MetLife, Metropolitan Life Retirement Plan for United States Employees,
Savings and Investment Plan for Employees of Metropolitan Life and Participating Affiliates, the
MetLife Auxiliary Pension Plan, and the Metropolitan Life Supplemental Auxiliary Savings and
Investment Plan.

which was denied as to Roganti's ERISA claims.  It is now before this Court for resolution, with the parties having consented to a summary trial on the administrative record.  Having carefully considered that record and the assessment of that record by MetLife as Plan Administrator, the Court renders judgment for Roganti, concluding that the arbitral award represented back pay.

I.    **Background**[2]

   A.  **Roganti's Employment with MetLife**

   The factual background to this controversy is detailed in the Court's Opinion and Order of June 18, 2012, in which it granted in part, and denied in part, defendants' motion to dismiss. Dkt. 17 ("MtD Op.").  In brief:

   Between 1971 and 2005, Roganti was a Met Life employee, beginning as an Account Representative and later becoming a Vice President.  SF ¶ 2.  During his tenure, he oversaw R. Roganti & Associates ("RR&A") and the Tower Agency Group ("TAG"), both of which were sizable subsets of MetLife's New York business.  Compl. ¶¶ 15, 17; SOC ¶¶ 8, 10.

   In 1999, Roganti's relationship with MetLife began to deteriorate, as he voiced concerns about what he viewed as suspect business practices.  SOC ¶ 14.  A protracted dispute between Roganti and MetLife followed.  Roganti claims that, between 1999 and 2005, MetLife repeatedly disregarded his complaints and came to actively retaliate against him, undermining his authority within RR&A and, ultimately, dissolving TAG.  *Id.* ¶¶ 15, 20, 28–35, 40–44.  Roganti claims that MetLife further retaliated against him by reducing his compensation, *id.* ¶¶ 24, 27, 47, 63, 66, with the specific goal of reducing his pension benefits, *id.* ¶ 1.  In March 2005, Roganti

---

[2] The Court's account of the underlying facts is drawn from the parties' Joint Statement of Facts ("SF") (Dkt. 35) and the stipulated Administrative Record ("AR") (Dkt. 32), including Roganti's Statement of Claim filed with FINRA (AR 600–16) (the "SOC").

retired from MetLife, his annual compensation having dropped precipitously, from $1,506,000 in 2002, to $475,000 in 2003, $383,000 in 2004, and $67,000 in 2005 (through March).  AR 2334.

**B.  Roganti's Arbitration Before FINRA**

On July 20, 2004, Roganti filed a Statement of Claim with the National Association of Securities Dealers ("NASD") in which he sought to arbitrate his disputes with MetLife.  SF ¶ 11.  Roganti brought claims for breach of contract and *quantum meruit*, and also alleged violations of ERISA and of the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A ("SOX").[3]   Articulating varying theories of damages, he sought between $11,483,000 and $32,764,506.  SF ¶ 12.

The SOC set out, in two places, the relief Roganti sought.  At the outset, the SOC stated:  "Roganti seeks back pay, liquidated damages, compensatory and punitive damages, attorneys fees and an accounting."  SOC ¶ 2.  And the SOC's concluding "Wherefore" clause demanded an order "directing an accounting of RR&A's revenues and expenses" and awarding "appropriate back pay, front pay and reimbursement for lost benefits . . . liquidated damages . . . attorneys fees, costs, disbursements and interest . . . punitive damages . . . [and] such further and additional relief as the Panel may deem just and proper."  *Id.* ¶ 90.  The FINRA panel summarized the relief Roganti was seeking as "unspecified compensatory damages, unspecified punitive damages, an accounting of R. Roganti & Associates' revenues and expenses, appropriate back pay, front pay and reimbursement for lost benefits, attorneys' fees, costs, disbursements, interest, and such further and additional relief as the Panel may deem just and proper."  AR 593–99 ("FINRA Award").

---

[3] Roganti also filed two complaints with the Department of Labor ("DoL"), alleging that MetLife had violated SOX by retaliating against him for reporting employee misconduct to management.  Compl. ¶¶ 55–56, 67–68.  The DoL eventually dismissed both claims.  *Id.* ¶ 7; SOC ¶ 3–4.

The FINRA arbitration was conducted between 2004 and 2010, and culminated in a 17-day hearing.  SF ¶ 21.  On August 28, 2010, the arbitral panel held MetLife liable.  In the two paragraphs announcing its determination, it awarded Roganti "compensatory damages in the amount of $2,492,442.07 above [MetLife's] existing pension and benefit obligation to Claimant."  FINRA Award at 2.   The panel did not, however, explain how it had arrived at this damages figure, or state concretely for what the Award was intended to compensate Roganti, save to state:  "Any and all relief not specifically addressed herein, including punitive damages, is denied."  *Id.*

### C.  MetLife's Initial Benefits Determination

On March 24, 2011, Roganti filed a benefits claim with MetLife, in its capacity as the Plan Administrator.  AR 590–99.  He noted that the nearly $2.5 million arbitral Award was described exclusively as representing "compensatory damages" and did not include punitive damages, legal fees, or other damages.  He asked that the Award be treated as compensation for income which MetLife had improperly denied him, and that the award be factored into the calculation of the benefits to which, since his retirement, he had been entitled under his pension plan with MetLife.  SF ¶ 24.  Under the pension plans applicable to Roganti, his pension was to be based on the average salary of the five non-consecutive years, out of his final 15 years at MetLife, in which he earned the highest salary.  AR 1823.  Roganti noted that his salary at MetLife had always been treated as benefits-eligible; therefore, he asserted, the FINRA Award, being compensation for income which MetLife had wrongly denied him, should be treated similarly.  SF ¶ 24.

In a letter dated June 16, 2011, MetLife denied Roganti's request.  AR 618–23.  The letter—signed by Karen B. Dudas, MetLife's Director of HR - Global Benefits ("Dudas

Letter")—stated that MetLife had denied the request because the Award did not qualify as benefits-eligible compensation. Dudas gave three reasons for this conclusion. First, Roganti had no longer been employed by MetLife at the time the panel issued the Award; thus the Award, even if it represented back pay, did not meet the Plans' definition of "annual compensation." AR 620. Second, the panel had not specifically denoted the Award as compensation for lost income; rather, FINRA had broadly termed its award "compensatory damages." *Id.* Third, the panel had not identified to which years of Roganti's employment these compensatory damages applied. Thus, Dudas stated, even if the Award represented unpaid benefits-eligible income, it would be impossible for MetLife to tabulate how the Award should affect Roganti's pension benefits. AR 621-22.

On July 20, 2011, Roganti appealed MetLife's decision. SF ¶ 29. On August 30, 2011, MetLife again denied his claim, in a letter signed by Andrew J. Bernstein, Vice President - HR Benefits and Plan Administrator ("First Bernstein Letter"). AR 654–59. Bernstein's letter adopted the reasoning of the Dudas Letter. It reiterated that FINRA had awarded only general "compensatory damages" and had not specified that the Award reflected relief for lost income. Bernstein thus concluded that the Award was not benefits-eligible. AR 655–56, 658–59. Bernstein's letter informed Roganti of his right to appeal under § 502(a) of ERISA. AR 659.

### D. Roganti's Lawsuit

On January 9, 2012, Roganti filed this lawsuit. Both of his claims challenged MetLife's denial of his request that the FINRA Award be treated as benefits-eligible compensation. In his first cause of action, under SOX, Roganti claimed that, in refusing to so treat the Award, MetLife was again retaliating against him for complaining about MetLife's business practices. Compl. ¶ 177. In his third cause of action, under ERISA, Roganti claimed that MetLife's refusal to treat

the Award as benefits-eligible compensation contradicted the terms of the pension plans.[4]  *Id.*
¶¶ 188-89.  On March 19, 2012, MetLife moved to dismiss.  Dkt. 6.

In a lengthy opinion issued on June 18, 2012, the Court granted that motion in part and
denied it in part.  The Court dismissed Roganti's SOX claim, because he had failed to exhaust
administrative remedies.  *See* MtD Op. 9–11.  But, as to the ERISA claim, the Court denied the
motion to dismiss.  The Court held that it was not clear on its face whether the arbitral Award
represented back pay, as Roganti argued, or some other unspecified form of compensatory
damages, as Met Life argued.  Because the Plan Administrator had solely relied on the Award's
terse and ambiguous language, and because on a motion to dismiss all inferences were required
to be drawn in favor of Roganti, MetLife's motion to dismiss could not be granted.  *Id.* at 14.

The Court then turned to the issue of how to resolve the parties' dispute as to whether the
Award represented back pay.  Eliciting from the members of the arbitral panel a clarification of
the basis for their Award was not a viable option.  *Id.* at 14–15.[5]  Instead, the Court concluded, it
was necessary to review the arbitral record to determine, in the context of the evidence and
arguments made before the arbitrators, what the Award represented.  (The Court noted that, at
oral argument, Roganti had represented that one of the back pay calculations his counsel had
supplied to the arbitrators in closing arguments resulted in an outcome that virtually matched the
Award.)  The Court held that it was appropriate for the Plan Administrator, in the first instance,
to make that assessment.  The Court accordingly remanded the case to MetLife as Plan

---

[4] Roganti's Complaint originally had a second cause of action, under the Dodd-Frank Act of
2010, 15 U.S.C. § 78u-6.  On April 30, 2012, the parties entered a stipulation, approved by the
Court, in which they agreed to dismiss that claim without prejudice.  Dkt. 12.

[5] At the time the Court heard argument on the motion to dismiss, it was advised that the three-
month time limit for Roganti to seek clarification of the Award from the arbitral panel had
lapsed.  *See* 9 U.S.C. § 12.  Therefore, there was no longer any ability to learn directly from the
arbitrators what the Award represented.

Administrator.  The Court directed the Plan Administrator to review anew Roganti's claim of

benefits-eligible compensation, this time examining the full record before the arbitral panel to

discern what the Award represented.  *Id.*

> The Court's specific directive was as follows:

>> Therefore, a close review of the arbitral record is at this point necessary, to permit a determination to be made, in the context of the evidence offered and arguments made by both sides at the arbitration, whether or not the award represented back pay.  Roganti's counsel represented to the Court that a calculation of his claims for back pay, based on the evidence before the arbitral panel, can result at a number quite closely approximating the award.  That may well be so, but conceivably, Defendants, upon a review of the arbitral record, could posit an alternative explanation, this time rooted in the materials supplied to the arbitral panel, as to what the panel's award represented.

>> In the Court's view, it is for the Plan Administrator, not this Court, in the first instance, to review the arbitral record and make this determination.

MtD Op. 15.  The Court directed the parties to develop a joint proposed order that returned the

matter to the Plan Administrator to conduct such a review, while providing that the Court would

retain jurisdiction to review the Plan Administrator's eventual determination.  *Id.* at 15–16.  The

parties did so, and on June 29, 2012, the Court approved that order.  Dkt. 18.

### E.   Proceedings on Remand to MetLife as Plan Administrator

On remand, Bernstein, MetLife's Vice President - HR Benefits and Plan Administrator,

was supplied with the entire arbitral hearing transcript and exhibits.  SF ¶ 39.  On September 24,

2012, in a six-page letter, Bernstein again concluded, as he had in August 2011, that the Award

did not represent benefits-eligible compensation.  *See* AR 714–19 ("Second Bernstein Letter").

Bernstein did not state what the Award represented.  Instead, Bernstein stated, there was "no

evidence . . . of any mathematical or formulaic calculation" given to the panel that would allow

him to reconstruct what the award to Roganti represented.  AR 714–15.  Further, Bernstein

stated, Roganti had sought, from the panel, a monetary award that took into account, among

other things, the improper diminution of his pension benefits.  Therefore, Bernstein stated, "any additional pension benefits Roganti sought during the arbitration were already included in and made part of the $2,492,442.07 Award . . . ."  AR 717.

Roganti thereupon challenged Bernstein's determination, and the case returned to this Court.  In light of the unusual nature of the case, in which the sole factual issue involved interpreting the meaning of the panel's Award to Roganti in light of the evidence and arguments made during the arbitration, counsel for both parties agreed that a summary trial on the administrative record was appropriate, in which the Court would resolve Roganti's challenge to the Plan Administrator's determination.  On March 1, 2013, the parties filed their joint statement of facts.  Dkt. 35.  On March 29, 2013, Roganti filed his trial brief.  Dkt. 36 ("Pl. Br.").  On May 1, 2013, defendants filed their trial brief.  Dkt. 38 ("Def. Br.").  On May 15, 2012, Roganti filed his reply.  Dkt. 40 ("Pl. Reply Br.").

On August 1, 2013, the Court heard oral argument.

## II.      Discussion

The sole issue before the Court is whether the arbitral panel's Award of $2,492,442.07 in compensatory damages to Roganti represented back pay.  MetLife, acting as Plan Administrator, determined that it did not.  If MetLife's decision was arbitrary and capricious, then judgment must be entered for Roganti, directing MetLife to treat the $2,492,442.07 Award as benefits-eligible compensation.  Otherwise, judgment must be entered for MetLife.  On MetLife's motion to dismiss, the Court was unable to resolve this issue because the parties disputed factually what the Award represented and because the arbitral record was not before the Court.  Now, however, with the Court having remanded the case to MetLife as Plan Administrator for its judgment

based on the arbitral record, with MetLife having addressed that issue, and with the arbitral

record before the Court, the Court may do so.

### A.    Principles Governing the Court's Review

At the outset, the Court reviews the background principles under ERISA and the standard

of review applicable to the Plan Administrator's determination.

ERISA creates a private right of action to enforce the provisions of a retirement benefits

plan. 29 U.S.C. § 1132(a)(1)(B). The statute does not prescribe the standard of judicial review

governing challenges to benefit eligibility determinations. Case law, however, holds that

"[w]hen an ERISA plan explicitly vests its administrator with discretion to interpret the plan,

federal courts may ordinarily overturn the administrator's benefits determination only upon a

finding that the determination is arbitrary and capricious." *Am. Int'l Grp., Inc. Amended &*

*Restated Executive Severance Plan v. Guterman*, 496 F. App'x 149, 151 (2d Cir. 2012); *see also*

*Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111 (1989) ("Trust principles make a

deferential standard of review appropriate where a trustee exercises discretionary powers.");

Restatement (Second) of Trusts § 187 (1959) ("Where discretion is conferred upon the trustee

with respect to the exercise of a power, its exercise is not subject to control by the court except to

prevent an abuse by the trustee of his discretion."); *Durakovic v. Bldg. Serv. 32 BJ Pension*

*Fund*, 609 F.3d 133, 142 n.2 (2d Cir. 2010) ("In an action under 29 U.S.C. § 1132(a)(1)(B), the

district court conducts arbitrary-and-capricious review of ERISA-fund administrators'

discretionary decisions."). In this case, it is undisputed that such discretion is vested in the Plan

Administrator. SF ¶¶ 7, 9.

"[A] decision of a Plan Administrator is arbitrary and capricious if it is without reason,

unsupported by substantial evidence, or erroneous as a matter of law." *Levitian v. Sun Life &*

*Health Ins. Co. (U.S.)*, 486 F. App'x 136, 139 (2d Cir. 2012) (quoting *Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 623 (2d Cir. 2008)) (internal quotation marks omitted).  "Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the administrator and requires more than a scintilla but less than a preponderance." *Durakovic*, 609 F.3d at 141 (quoting *Celardo v. GNY Auto. Dealers Health & Welfare Trust*, 318 F.3d 142, 146 (2d Cir. 2003)).  "Where both the plan administrator and a spurned claimant offer rational, though conflicting, interpretations of plan provisions, the administrator's interpretation must be allowed to control." *McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 132 (2d Cir. 2008) (quoting *Pulvers v. First Unum Life Ins. Co.*, 210 F.3d 89, 92–93 (2d Cir. 2000)).  However, the Court must always consider "whether the decision was based on a consideration of the relevant factors." *Miller v. United Welfare Fund*, 72 F.3d 1066, 1072 (2d Cir. 1995) (citation omitted).  Accordingly, "where the administrator imposes a standard not required by the plan's provisions, or interprets the plan in a manner inconsistent with its plain words, its actions may well be found to be arbitrary and capricious." *McCauley*, 551 F.3d at 133 (quoting *Pulvers*, 210 F.3d at 93).   As the Supreme Court has noted, "[a]pplying a deferential standard of review does not mean that the plan administrator will prevail on the merits." *Conkright v. Frommert*, 559 U.S. 506, 521 (2010).  Deference simply ensures that "the plan administrator's interpretation of the plan will not be disturbed if reasonable." *Id.* (quoting *Firestone Tire*, 489 U.S. at 111).

A relevant factor the Court must consider, in deciding whether the Plan Administrator abused his discretion in making a benefits eligibility determination, is whether the Plan Administrator was subject to a conflict of interest.  "If a benefit plan gives discretion to an administrator or fiduciary who *is operating under a conflict of interest*, that conflict must be

*weighed as a factor* in determining whether there is an abuse of discretion." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008) (citation omitted) (emphasis in original). A conflict of interest exists "where it is the employer that both funds the plan and evaluates the claims." *Id.* at 112. Such is the case here, because MetLife both funds the plans and determines benefits eligibility. *See generally* Dkt. 39 ("Bernstein Decl."). "Such a conflict is one of several different considerations that are weighed in determining whether discretion has been abused, any one of which will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-specific importance." *Am. Int'l Grp., Inc. Amended & Restated Executive Severance Plan v. Guterman*, No. 10 Civ. 9390 (LTS)(FM), 2011 WL 4072016, at *5 (S.D.N.Y. Sept. 13, 2011) (quoting *Glenn*, 554 U.S. at 117), *aff'd*, 496 F. App'x 149 (2d Cir. 2012) (internal quotation marks omitted).

## B.    Analysis

The issues presented here are narrow: Did the arbitral panel's Award to Roganti of $2,492,442.07 represent back pay, and did the Plan Administrator abuse his discretion in concluding that it did not?

These issues do not implicate any question of Plan interpretation. It is undisputed that, under the two pension plans at issue,[6] salary is a form of benefits-eligible compensation. *See* AR 143–44, 408–10. And this Court has already held that, under the Plan, salary paid to a former employee in the form of a back pay award is benefits-eligible. The Court thus rejected MetLife's argument that only compensation actually received by an employee during his employment is benefits-eligible and that court-ordered back pay to redress the unlawful nonpayment of salary is

---

[6] These are the Metropolitan Life Retirement Plan for United States Employees (the "Pension Plan"), and the Savings and Investment Plan for Employees of Metropolitan Life and Participating Affiliates (the "SIP Plan"). SF ¶¶ 4–5. MetLife is the Plan Administrator for both. *Id.* ¶ 6.

not.  *See* MtD Op. 12 ("Although Roganti was no longer employed at the time of the award, if

that award represented back pay to compensate him for services rendered while he was a

MetLife employee, such compensation would properly be included in benefits calculations.").

The proper starting points for considering whether the Award represented back pay are

the relief sought by Roganti in arbitration and the decision issued by the panel.  Roganti brought

four claims.  The first three sought damages based on Roganti's reduced compensation from

MetLife.  As noted, Roganti's pay dropped dramatically after the year 2002, as he received

progressively lower pay in the years 2003, 2004, and the first quarter of 2005.  The first claim,

for breach of contract, asserted that MetLife had reduced Roganti's compensation in breach of a

contractual commitment.  The second, for violations of SOX's anti-retaliation provision, asserted

that MetLife had reduced Roganti's compensation in retaliation for his having reported

questionable business practices by MetLife.  The third, under the doctrine of *quantum meruit*,

sought to recover the reasonable value of the services that Roganti asserted he had rendered to

MetLife but had been underpaid for by virtue of his reduced compensation.  SOC ¶¶ 83–88; SF

¶¶ 16–18.  The fourth claim, for ERISA violations, asserted that MetLife, by reducing Roganti's

compensation, had also effectively reduced the calculation of Roganti's pension benefits.  SOC

¶ 90; SF ¶ 19.  In addition, Roganti, in the introduction to the SOC, had stated generically that he

sought "back pay, liquidated damages, compensatory and punitive damages, attorneys fees, and

an accounting."  SOC ¶ 2; SF ¶ 14.

In its decision, the arbitral panel stated only the following:

> After considering the pleadings, the testimony and evidence at the hearing, the
> Panel has decided in full and final resolution of the issues submitted for
> determination as follows:

1. Respondent is liable for and shall pay to Claimant compensatory damages in the amount of $2,492,442.07 above its existing pension and benefit obligation to Claimant.
2. Any and all relief not specifically addressed herein, including punitive damages, is denied.

FINRA Award at 2.

Considering Roganti's claims and the Award together, the parties agree that one may narrow to a select few candidates the species of damages that the Award may have represented. First, because the Award represented "compensatory damages," it necessarily did not encompass punitive damages or attorneys' fees. Second, within the universe of compensatory damages, Roganti made no claim of emotional or similar intangible injuries, *e.g.*, as might stem from a hostile work environment. Rather, the compensatory damages awarded could logically have reflected only three things: (1) compensation to Roganti for improper reductions of his pay during his tenure at MetLife, which, as noted, ended in March 2005; (2) compensation to Roganti for pay he would have earned had his tenure at MetLife lasted beyond March 2005; and (3) compensation for diminution of Roganti's pension, the size of which was derived from his average pay during the highest five of his final 15 years at MetLife, and which likely would have been higher had the panel accepted Roganti's claim that his compensation in his final years at MetLife had wrongfully been reduced.[7] However, the Award does not, on its face, permit one to determine which (or which combination) of these elements the Award represented. The panel's statement that the $2,492,442.07 was "above [MetLife's] existing pension and benefit obligation to Claimant" does not resolve this question: It instead connotes only that the Award did not encompass the pension and benefits to which, entering the arbitration, Roganti was undisputedly entitled.

---

[7] Roganti's pension has heretofore been calculated based on his compensation during the years 1998, 1999, 2000, 2001, and 2002. SF ¶ 28.

Dating back to the initial round of litigation before this Court, Roganti has consistently articulated a coherent explanation for the Award:  He argues that it represents solely back pay, and he has come forward with simple calculations that yield a number just $19.46 higher than the Award.  Specifically, Roganti posits that the Award represents back pay for 2003, 2004, and the portion of 2005 he worked before he retired.  Pl. Br. 1–2.  He uses his 2002 income ($1,506,000) as a baseline from which improper reductions of his income in the succeeding three years (2003, 2004, and, as prorated to reflect the portion he worked, 2005) are to be measured.  The Court has reproduced his calculations below:

| Year | Projected | Actual | Shortfall |
|---|---|---|---|
| 2003 | $1,506,000.00 | $475,000.00 | $1,031,000.00 |
| 2004 | $1,506,000.00 | $383,000.00 | $1,123,000.00 |
| 2005 | $405,461.53 | $67,000.00 | $338,461.53 |
| Total | $3,417,461.53 | $925,000.00 | $2,492,461.53 |

The FINRA panel awarded Roganti $2,492,442.07—just $19.46 less than what Roganti would have been owed had damages been calculated in this fashion.  In fact, the difference between the Award and Roganti's calculations is less than 0.001%.

Roganti's calculations are consistent with a theory of damages that he pursued at the arbitration.  In his closing statement to the panel, after addressing liability, Roganti's counsel outlined various theories of damages.  He began by stating that he would focus on calculating damages under SOX, because that cause of action permitted a front pay award, meaning an award of damages covering the period after the arbitral award, as well as back pay, meaning an award of damages covering the period up to that award.  However, he stated, the concept of making the employee whole to the extent compensation had unlawfully been reduced equally applied to his other theories of liability.  AR 2078.  He then listed the types of damages Roganti was seeking:  back pay, front pay, attorneys' fees, costs of the arbitration sessions, interest, and

punitive damages under the arbitrator's manual (but not under SOX).  *Id.*  He did not refer to any other form of compensatory damages.

Roganti's counsel argued to the panel:  "So what would Ron [Roganti] have earned but for the retaliatory acts? . . . It's broken down into back pay and front pay."  *Id.*  Counsel defined back pay for the panel as "the amount that would make Ron whole through the date that this panel issues an award."  *Id.*  Acknowledging that fixing a damages award inherently involved "a degree of speculation," Roganti's counsel then identified several alternative measures of back pay damages.  *Id.*  The first, and most ambitious, began with Roganti's 2001 salary ($2,007,000) and assumed a yearly 4% increase, in line with general MetLife projections.  *Id.* at 2079.  The second theory of damages, relevant here, assumed that Roganti's pay remained flat at the 2002 level ($1,506,000), and then calculated the shortfall between that figure and the compensation Roganti in fact received in 2003, 2004, and through his retirement in March 2005, which counsel referred to as a "stub year."  *Id.* at 2079–80, 2334.  Counsel's description of this theory outlined Roganti's damages each year from 2003 forward, and extended through September 30, 2010, some six weeks after the date of the arbitration's closing argument (August 17, 2010).  *Id.*  The third theory of damages assumed a starting salary that was an average of Roganti's 2001 and 2002 salaries, and included a yearly 4% increase.  *Id.*  Each of these theories, to the extent it sought recovery for periods after March 2005, was predicated on the assumption that, but for MetLife's retaliatory acts, Roganti, who was 61 as of the arbitration, would not have retired until reaching age 62.  *Id.* at 2079.

It is the second approach—which assumed a continuing flat salary at the 2002 level—that Roganti here contends the panel adopted.  Under that approach, Roganti asked the panel to award him $7,350,000 in total back pay damages through September 30, 2010 (crediting MetLife for

the pension payments it had made to Roganti during his retirement).  *Id.*  Roganti contends that

the panel awarded him damages using this measure of damages, but that it cut off damages as of

the end of March 2005, when Roganti retired, and therefore declined his counsel's invitation to

assume that Roganti's tenure at MetLife would have continued past that date.  As noted, that

approach—which entails simply adding the shortfalls in compensation for 2003, 2004, and the

first quarter of 2005, as listed on the chart that Roganti's counsel put before the panel—results in

damages of $2,492,461.53, virtually identical to the figure awarded.

      Implicit in this calculation is that the panel did not include in its award any increase that

heightened compensation for 2003–2005 would have had on the pension to which Roganti was

entitled.  Roganti's counsel did invite the panel, as part of an award of front pay, to take that

prospect into account, as part of a front pay award.  But the panel was not supplied with the

specific formula that MetLife would use, pursuant to the Plan, to tabulate precisely how an

award of back pay covering Roganti's years of employment would affect MetLife's pension

obligation to him.  And Roganti's counsel also invited the panel not to undertake such a task, and

instead to leave the calculation of the pension impact of an award to MetLife:

> But once again, I don't want to be unduly speculative.  So to the extent this panel
> has concerns about awarding front pay in specific amounts, I submit that an award
> should be rendered which says assume Ron had earned such and such through the
> date of his retirement at 62 and, MetLife, give him the appropriate pension
> amounts based on that.  Met can adjust its pension.

AR 2080.  Roganti argues that the panel did exactly that:  that it left to MetLife the task

of adjusting Roganti's pension in light of the Award.

      Consistent with this, at the end of closing arguments, the panel's chairman asked whether

Roganti's counsel had appropriately discounted the front pay he sought for the present value of

future payments.  AR 2081.  Roganti's counsel acknowledged that he had not done so, and that

doing so would be necessary before front pay could be awarded.  *Id.*  This colloquy is consistent with the premise that the panel eschewed awarding front pay and suggests that the panel chose not to award front pay, instead leaving it to MetLife to do so.

In the Court's view, Roganti's explanation for the panel's Award is coherent and logical. The simplicity of Roganti's explanation, its anchor in the evidence and arguments put before the panel, and the fact that it yields an outcome that virtually matches the Award are compelling.  No other explanation has been advanced that accounts for the Award.  And the Court's independent review of the arbitral record suggests no alternative explanation.

The issue, then, for the Court is whether MetLife, as Plan Administrator, abused its discretion in determining, despite Roganti's having proffered a convincing explanation for the Award, that the Award could not be accounted for and thus did not represent benefits-eligible compensation.  Having closely reviewed the Second Bernstein Letter, the Court concludes MetLife did abuse its discretion in so concluding.

The principal basis for MetLife's conclusion in its own favor was that there was extensive testimony at the arbitration about the pension plans to which Roganti was subject. Second Bernstein Letter at 2–3.  MetLife's letter in fact tabulated the many times the word "pension" appeared in the transcript of the arbitration.  *Id.*  On this basis, and because Roganti's counsel "specifically request[ed] back pay and additional pension benefits," MetLife concluded that it "appears clear that the arbitration panel fully considered these arguments when they decided the matter and did not award Roganti back pay or any benefit eligible compensation." *Id.* at 3.

But MetLife's analysis begs the question.  Theoretically, of course, the panel's Award could have been intended to compensate Roganti for the impact on his pension of compensation

that was wrongly denied him.  As noted, Roganti did request such relief.  Were this so, the Award would not reflect benefits-eligible compensation, as it would have incorporated into its relief to Roganti its calculation of the improper diminution to his pension.  But based on the arbitral record, it is far more likely that the Award consisted solely of benefits-eligible back pay. As noted, Roganti alternatively requested that relief alone, and invited the Panel to not undertake an examination of the consequences of a back pay award on Roganti's pension. The Court's recognition that either of these explanations was, in theory, possible was what led the Court to remand the matter.  The Court directed the parties to delve deeper, and explore concretely, in light of the evidence and arguments as to damages presented at the hearing, what the $2,492,442.07 Award in fact represented.

MetLife's Plan Administrator failed to undertake that inquiry.  MetLife chose instead to collect and present arguments why the Award might not represent, or solely represent, benefits-eligible compensation (*e.g.*, that Roganti also sought compensation for diminution of his pension).  But MetLife's letter is devoid of any attempt to illustrate, based on the evidence and arguments before the panel, why the damages award actually issued might reveal that this was so.  MetLife's letter is devoid of any analysis of the damages outcomes that the evidence and theories of damages presented to the panel would have yielded, let alone any assessment of how the Panel's specific Award came to be in light of the materials before it.  Instead, MetLife declared such an exercise impossible.  MetLife thus passed on the Court's request that it posit, based on the record, a concrete alternative explanation to Roganti's for the Award.  MtD Op. 15. Strikingly and unreasonably, MetLife ignored Roganti's convincing claim that the Award simply replenished his reduced income during 2003, 2004, and the stub period of 2005, using his higher 2002 income as a baseline—a claim Roganti first articulated during the motion to dismiss

litigation—and made no attempt to consider this explanation in the evenhanded, neutral manner

one would expect from a fiduciary agent. *Cf. McCauley*, 551 F.3d at 138 ("First Unum's

reliance on one medical report in support of its denial to the detriment of a more detailed

contrary report without further investigation was unreasonable."); *Durakovic*, 609 F.3d at 140

(criticizing the Funds' consideration of the claim as "one-sided" because it "summarily

dismissed the report by Durakovic's vocational expert, which was vastly more detailed and

particularized than the report on which the Funds relied, that of their own vocational expert").

MetLife's naysaying submission, in sum, presents as the work of an advocate for an outcome,

not that of a neutral Plan Administrator seeking to follow the facts where they most convincingly

lead.

      MetLife did make a separate argument in its letter, which it reiterates in its brief to this

Court.  It asserted that the Award could not be treated as benefits-eligible compensation because

the Panel did not label the Award as compensation for foregone income or allocate that income

to specific years of Roganti's service. *See* Second Bernstein Letter 6; Def. Br. 10.  MetLife

noted that there was testimony before the Panel to the effect that Roganti's pension would be

calculated based upon the "top five years" in which he earned a salary at MetLife.  From this,

MetLife concludes:

> [T]he references to the pension benefits in the record clearly support that the
> arbitration panel clearly understood Roganti's position that he was seeking
> additional pension benefits as a result of his compensation being reduced;
> however, the panel chose not to award Roganti back pay or to label any part of the
> award as additional benefit eligible compensation.

Second Bernstein Letter at 4.  But MetLife's argument proves too much.  It undeniably would

have been preferable for the panel to specify, assuming the Award represented back pay, to

which years that back pay Award related, just as it would have been preferable for the panel to

state, assuming the Award did not represent back pay, what it was intended to compensate Roganti for.  But the Award's inexactitude is what prompts these proceedings.  And neither party appears to have told the panel that, for the benefit of calculating pension impact, a back pay award should break out Roganti's lost income by year.  The closest either party came was when Roganti's counsel, in closing, told the panel it could leave front pay unaddressed and let MetLife calculate the pension benefits later.  MetLife's counsel did not advise the panel otherwise in its closing.

Further, Roganti's explanation does readily permit one to attribute the $2,492,442.07 Award across the three years.  As reflected in the chart Roganti presented to the panel, AR 2334, $1,031,000 is allocable to 2003, reflecting the gap between Roganti's 2002 and 2003 income; $1,123,000 is similarly allocable to 2004; and the balance of $338,442.07 is allocable to 2005.[8] Whatever the consequences might be had a back pay award been made that was not capable of ready year-by-year attribution, that problem is not presented here.

Under these circumstances, the Court holds that MetLife abused its discretion in denying the existence of a convincing explanation for the Award and that the Award reflected back pay. Had MetLife come forward with a rational accounting for the Award as issued, or impeached Roganti's explanation as implausible so as to leave no viable explanation, the Court would not have hesitated to uphold MetLife's determination as a valid exercise of its discretion.  *See, e.g., McCauley*, 551 F.3d at 132 ("Where both the plan administrator and a spurned claimant offer rational, though conflicting, interpretations of plan provisions, the administrator's interpretation must be allowed to control.").  But such is not the case.  MetLife, having brushed aside the

---

[8] Although the $19.46 differential between the Award and the recovery that Roganti's method would yield is unexplained, it is most logically attributed to the 2005 stub year, as to which some degree of arithmetic extrapolation was needed to derive the shortfall that year.

Court's directive as to the inquiry on remand, having ignored Roganti's explanation for the Award, and having posited no specific explanation of its own, did not make a determination "based on a consideration of the relevant factors." *Miller*, 72 F.3d at 1072 (citation omitted); *see Cities of Carlisle & Neola, Iowa v. F.E.R.C.*, 741 F.2d 429, 433 (D.C. Cir. 1984) (explaining in a different context that agency expertise "deserves deference only when it is exercised; no deference is due when the agency has stopped shy of carefully considering the disputed facts"); *cf. Greenpeace v. Nat'l Marine Fisheries Serv.*, 80 F. Supp. 2d 1137, 1147 (W.D. Wash. 2000) (agency decision reviewed under the Administrative Procedures Act "is arbitrary and capricious and will be set aside when it has failed to articulate a satisfactory explanation for its conclusions or when it has entirely failed to consider an important aspect of the problem"). The Court therefore holds that MetLife acted arbitrarily and capriciously in denying Roganti benefits. The Court adopts Roganti's convincing explanation for the Award.

Although the above analysis alone amply justifies this holding, the Court notes two other relevant considerations that reinforce it.

First, MetLife is operating under a structural conflict of interest. It functioned here both as Plan Administrator and as the entity responsible for paying Roganti's substantial pension. MetLife's perplexing refusal to make any attempt to account for the Panel's award, despite the Court's clear directive as to the purpose of the remand it ordered, may perhaps be explained by this conflict. *See Glenn*, 554 U.S. at 118 (noting that factors suggestive of procedural unreasonableness may "justif[y] the court in giving more weight" to the conflict of interest, particularly when the unreasonable positions are "financially advantageous"); *McCauley*, 551 F.3d at 135 (stating that the unreasonable behavior described in the opinion was "exacerbated by First Unum's conflict of interest, as both administrator and payor, for what else would have

influenced First Unum to avoid following up on simple inquiries"); *id.* at 138 (considering the facts "collectively lead[s] to the conclusion that First Unum was in fact affected by its conflict of interest"); *Alberigo v. The Hartford*, 891 F. Supp. 2d 383, 397 (E.D.N.Y. 2012) (the fact that defendant's justification for denying benefits was irrational and sometimes false "leads to the conclusion that [its] conflict of interest significantly affected its decision").

Second, the highly unusual task called for by the Court's remand—reverse-engineering an arbitration panel's award in light of the evidence and arguments put before it—is not a task to which a Plan Administrator has specialized expertise.  That task instead resembles the familiar work of a court.  The work of sifting testimonial and documentary evidence, evaluating counsel's arguments, and assessing the factual bases for an arbitral ruling is quite unlike the determinations by a Plan Administrator that justifiably merit deference.  These typically involve, for example, interpreting uncertain terms in a Plan with which the Administrator has vested responsibility or utilizing specialized knowledge and expertise.  *See, e.g.*, *Firestone Tire*, 489 U.S. at 111 ("A trustee may be given power to construe disputed or doubtful terms, and in such circumstances the trustee's interpretation will not be disturbed if reasonable."); *Conkright*, 559 U.S. at 517 (stating that deference "promotes predictability, as an employer can rely on the expertise of the plan administrator rather than worry about unexpected and inaccurate plan interpretations that might result from *de novo* judicial review").  To be sure, the Plan Administrator's assessment of the arbitral record had the potential to assist the Court.  The Court envisioned that the Plan Administrator would sort the evidence and test the damage outcomes yielded by the various remedial formulas suggested to the panel to see how they compared with the panel's Award. MetLife did not do so.  But even if MetLife had done so, there is a substantial argument that its assessment would have merited less deference than in the ordinary course, given that its

assignment on remand did not call upon its natural area of expertise. *See, e.g.*, *Bruch v. Firestone Tire & Rubber Co.*, 828 F.2d 134, 144 (3d Cir. 1987), *aff'd in part, rev'd in part*, 489 U.S. 101 (1989) (holding that *de novo* review of benefit denials was justified by, *inter alia*, the fact that the issue there did not "turn on information or experience which expertise as a claims administrator is likely to produce"); *Sec'y of Labor, Mine Safety & Health Admin. V. W. Fuels-Utah, Inc.*, 900 F.2d 318, 321 (D.C. Cir. 1990) (deference is "most compelling when the agency's construction rests upon matters peculiarly within the administrator's field of expertise"); *see also Jicarilla Apache Tribe v. Fed. Energy Regulatory Comm'n*, 578 F.2d 289, 292–93 (10th Cir. 1978) ("When the administrative interpretation is not based on expertise in the particular field, however, but is based on general common law principles, great deference is not required."); *cf. S. Mut. Help Ass'n, Inc. v. Califano*, 574 F.2d 518, 526 (D.C. Cir. 1977).

### C.  Attorneys' Fees

Roganti also seeks attorneys' fees.

ERISA provides that "[i]n any action [brought under ERISA] . . . by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party."  29 U.S.C. § 1132(g)(1); *see also LaForest v. Honeywell Int'l Inc.*, 569 F.3d 69, 74 (2d Cir. 2009).  Before a court may award attorney's fees under this section, however, a fee claimant must "show some degree of success."  *Hardt v. Reliance Standard Life Ins. Co.*, 130 S. Ct. 2149, 2158 (2010).  This prerequisite is not satisfied by "achieving trivial success on the merits or a purely procedural" victory; it is only met if "the court can fairly call the outcome of the litigation some success on the merits without conducting a lengthy inquiry into the question whether a particular party's success was substantial or occurred on a central issue."  *Id.* (internal quotation marks omitted).

The Court begins "its § 1132(g)(1) analysis by determining whether a party has achieved some degree of success on the merits" but "is not required to award fees simply because this pre-condition has been met."  *Id.*  Rather, the Court may decide to weigh, within its discretion, the five factors the Second Circuit previously required courts to consider in the context of requests for attorneys' fees:

> (1) the degree of the offending party's culpability or bad faith, (2) the ability of the offending party to satisfy an award of attorney's fees, (3) whether an award of fees would deter other persons from acting similarly under like circumstances, (4) the relative merits of the parties' positions, and (5) whether the action conferred a common benefit on a group of pension plan participants.

*Chambless v. Masters, Mates & Pilots Pension Plan*, 815 F.2d 869, 871 (2d Cir. 1987).  In *Hardt* the Supreme Court held that the Fourth Circuit's analogous five-factor test for awarding attorneys' fees "bear[s] no obvious relation to § 1132(g)(1)'s text," and that the consideration of these five factors was therefore "not required for channeling a court's discretion when awarding fees" under ERISA.  *Hardt*, 130 S. Ct. at 2158.  The Court did not "foreclose the possibility" that "a court may consider the five factors" when deciding whether to award attorney's fees, *id.* at 2158 n.8, but it abrogated Second Circuit precedent that made the test mandatory.  *See Levitian*, 486 Fed. App'x at 141.  Subsequently, the Second Circuit held that a "court may apply—but is not required to apply—the *Chambless* factors in channeling its discretion when awarding fees" under ERISA. *Toussaint v. JJ Weiser, Inc.*, 648 F.3d 108, 110–11 (2d Cir. 2011).  A simple recitation of the *Chambless* factors as prelude to a denial of attorney's fees, however, "constitutes an error of law."  *Levitian*, 486 Fed. App'x at 141.  Courts must "explain in writing the basis for its decision."  *Id.* (citing *Connors v. Conn. Gen. Life Ins. Co.*, 272 F.3d 127, 137 (2d Cir. 2001)).

Here, the Court has held that MetLife abused its discretion in refusing to treat the panel's Award as benefits-eligible compensation.  Because this outcome may fairly be characterized as success on the merits for Roganti, he is eligible to collect attorneys' fees under § 1132(g)(1).  *See Toussaint*, 648 F.3d at 110 ("So long as a party has achieved some degree of success on the merits, a court in its discretion may allow a reasonable attorney's fee and costs of action to either party.") (internal quotation marks omitted).

However, based on a consideration of the relevant factors, the Court concludes that an award of attorneys' fees and costs is not appropriate in this case.  First, although MetLife's decision not to treat the panel's Award as benefits-eligible compensation was an abuse of discretion, there is no indication that the decision was made in bad faith.  The circumstances of Roganti's claim and the issues presented in this case were highly unusual.  They required the Plan Administrator to make determinations that fell outside his specialized experience and expertise.  It is therefore perhaps unsurprising, to some extent, that his decision was so incorrect as to be deemed arbitrary and capricious by this Court.  Second, although MetLife would likely be able to satisfy any award of fees, the Court does not believe that such an award would serve to deter other persons from acting similarly under like circumstances.  The issue MetLife was tasked with resolving is rare enough to blunt any deterrent effect that might have otherwise been generated by an award of attorneys' fees.  The outcome of a case this unusual and individualized to Roganti is also unlikely to confer any common benefit on other pension plan participants.  For the foregoing reasons, the Court declines to award Roganti attorneys' fees under § 1132(g)(1).

## CONCLUSION

For the reasons stated above, the Court holds that (1) the FINRA panel's Award to Roganti of  $2,492,442.07 represented back pay; that such back pay is to be deemed benefits-

eligible compensation under the terms of the Plans; and that defendants are to allocate this sum to Roganti's income in the years 2003, 2004 and 2005, in the amounts specified above, for purposes of calculating Roganti's pension; *see supra*, pp. 14, 20; and (2) MetLife, as Plan Administrator, abused its discretion, and acted arbitrarily and capriciously, in concluding otherwise.  Because MetLife's denial of benefits was unreasonable, and because the record supplies a solid basis on which to attribute the arbitral Award to particular years in particular amounts, another remand would be "a useless formality." *Solomon v. Met. Life Ins. Co.*, 628 F. Supp. 2d 519, 533 (S.D.N.Y. 2009) (citing *Miller*, 72 F.3d at 1071); *Zervos v. Verizon N.Y.*, 277 F.3d 635, 648 (2d Cir. 2002) ("[R]emand of an ERISA action seeking benefits is inappropriate where the difficulty is not that the administrative record was incomplete but that a denial of benefits based on the record was unreasonable.").

The Court directs counsel for Roganti and defendants to, within the next week, identify what, if any, open issues remain to be addressed in this lawsuit.  The parties shall submit to the Court, by October 7, 2013, a joint letter addressing this subject.


SO ORDERED.

Paul A. Engelmayer
United States District Judge


Dated: September 25, 2013
        New York, New York